

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

JAN 2 6 2016

David J. Bradley, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § | |
| v. | § § | Criminal No. M-16-0135 |
| ANDRES ALY ALVAREZ, JR. <br> MARTHA JOSEFINA DOMINGUEZ | § § | |

## CRIMINAL INFORMATION

THE UNITED STATES ATTORNEY CHARGES:

At all times material to this Information:

### THE MEDICARE PROGRAM

1. The Medicare program (Medicare) is a federally funded health care program designed to provide medical care to individuals over age 65 and individuals with disabilities. Medicare is administered by the Centers for Medicare and Medicaid Services (CMS), a federal agency under the U.S. Department of Health and Human Services (HHS). Medicare is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

2. Medicare is divided into multiple Parts: Medicare Part A (hospital insurance) and Medicare Part B (medical insurance). Medicare Part A covers inpatient hospital, inpatient skilled nursing, inpatient hospice, and some home health care services. Medicare Part B covers physician's services and outpatient beneficiary care, including some home health care services. Among the types of reimbursable medical assistance available to covered persons is Home Health Care.

1

3. Individuals who qualify for Medicare benefits are commonly referred to as "beneficiaries." Each beneficiary is given a Medicare identification number, referred to as a Health Insurance Claim Number (HICN).

4. Home Health companies, pharmacies, physicians, and other health care providers that provide services to Medicare beneficiaries are referred to as "providers." To participate in Medicare, a provider is required to submit an application in which the provider agrees to comply with all Medicare related laws and regulations. If Medicare approves a provider's application, Medicare assigns the provider a National Provider Identification (NPI) number. A health care provider with a Medicare NPI number can file claims with Medicare to obtain reimbursement for medically necessary services rendered to beneficiaries.

Once Medicare approves a provider's application, the provider is supplied with a current copy of the Medicare Part A and Part B Provider Manuals. In addition, Medicare provides further guidance and updates in the form of bulletins and newsletters which are distributed to health care providers. The Medicare Provider Manuals, bulletins, and newsletters contain the laws, rules, and regulations pertaining to Medicare-covered services including those rules and regulations regarding the requirements pertaining to providing and billing for home health care.

## HOME HEALTH SERVICES

5. Homebound status is defined in the Medicare Benefit Policy Manual Chapter 7 Section 30.1.1, which states, "In order for a patient to be eligible to receive covered home health services under both Part A and Part B, the law requires that a physician certify in all cases that the patient be confined to his/her home." An individual does not have to be bedridden to be considered confined to the home. However, the condition of these patients should be such that there exists a normal inability to leave home and, consequently, leaving home would require a

considerable and taxing effort. Generally speaking, a patient will be considered to be homebound if they have a condition due to an illness or injury that restricts their ability to leave their place of residence except with the aid of supportive devices such as crutches, canes, wheelchairs, and walkers; the use of special transportation; or the assistance of another person; or if leaving home is medically contraindicated.

The Electronic Code of Federal Regulations, Title 42 Subpart B § 424.22 - Requirements for home health services, states in part, Medicare Part A or Part B pays for home health services only if a physician certifies and re-certifies the content specified in paragraphs (a)(1) and (b)(2) of this section, as appropriate.

(a) Certification - (1) Content of certification. As a condition for payment of home health services under Medicare Part A or Medicare Part B, a physician must certify as follows:

> (i) The individual needs or needed intermittent skilled nursing care…-If a patient's underlying condition or complication requires a registered nurse to ensure that essential non-skilled care is achieving its purpose, and necessitates a registered nurse be involved in the development, management, and evaluation of a patient's care plan, the physician will include a brief narrative describing the clinical justification of this need. If the narrative is part of the certification or re-certification form, then the narrative must be located immediately prior to the physician's signature. If the narrative exists as an addendum to the certification or re-certification form, in addition to the physician's signature on the certification or re-certification form, the physician must sign immediately following the narrative in the addendum.

(ii) Home health services were required because the individual was confined to the home except when receiving outpatient services.

(iii) A plan for furnishing the services has been established and is periodically reviewed by a physician who is a doctor of medicine, osteopathy, or podiatric medicine, and who is not precluded from performing this function under paragraph (d) of this section. (A doctor of podiatric medicine may perform only plan of treatment functions that are consistent with the functions he or she is authorized to perform under State law.)

Re-certification is required at least every 60 days, preferably at the time the plan is reviewed, and must be signed and dated by the physician who reviews the HHS CMS "Home Health Certification and Plan of Care," also known as Form CMS-485 (hereinafter referred to as a 485 Form).

6.   In the Medicare application, the provider agreed to submit claims that were accurate, complete and truthful, including but not limited to, claims for services that are medically necessary.

## THE TEXAS MEDICAID PROGRAM

7.   The Texas Medical Assistance Program also known as the Texas Medicaid program (herein after referred to as "Texas Medicaid"), was implemented under the provisions of Title XIX of the federal Social Security Act and Chapter 32 of the Texas Human Resources Code, for the purpose of providing joint state and federal funds to pay for medical benefits items or medical services furnished to individuals of low income who were qualified and enrolled as Texas Medicaid recipients. States desiring to participate in, and receive funding from, the federal

Medicaid program were required to develop a "state plan" for medical assistance and obtain approval of the plan from the United States Department of Health and Human Services. Upon approval of its state plan, each individual state administered its own Medicaid program, subject to the requirements of the state plan, the Social Security Act, the United States Department of Health and Human Services and all other applicable state and federal laws. Texas Medicaid was a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

8. Texas Medicaid assigned every person qualified and enrolled as a Texas Medicaid recipient a unique personal Texas Medicaid identification number known as a Patient Control Number ("PCN").

9. The Texas governmental agency known as the Health and Human Services Commission ("HHSC") was the single state Medicaid agency in Texas responsible, subject to oversight by the federal government, for administering the Texas Medicaid program at the state level. Federal funding was only available to the Texas Medicaid program as long as the Texas Medicaid program complied with the terms and requirements of the state plan, the Social Security Act, the United States Department of Health and Human Services, and all other applicable state and federal laws, and with the rules and regulations established by both the federal government and the State of Texas pertaining to Texas Medicaid.

10. The Texas Medicaid & Healthcare Partnership (hereinafter referred to as "TMHP") was under contract with HHSC to provide certain administrative functions such as provider enrollment, claims processing and payment, and published the Texas Medicaid Provider Procedures Manual which contained the rules and regulations of the Texas Medicaid program established by the state plan and by HHSC. The Texas Medicaid Provider Procedures Manual, bulletins, and banner messages were distributed and available to all Texas Medicaid providers and

contained the rules and regulations pertaining to Medicaid-covered services, and instructions on how to appropriately bill for services provided to Medicaid recipients.

11. Texas Medicaid funds were intended to pay for covered medical services furnished to Texas Medicaid recipients, by enrolled Texas Medicaid providers, when such medical services were furnished in accordance with all of the rules, regulations, and laws which governed Texas Medicaid. Covered Texas Medicaid services included medial services and procedures furnished by physicians and other health care professionals in their offices; as well as certain products, supplies, and services used outside a physician's office such as diabetic and incontinent supplies, which were commonly known as Durable Medical Equipment (DME).

12. A person or entity that desired to become a Texas Medicaid provider was required to submit an application and sign an agreement which included a promise to comply with all Texas Medicaid related laws and regulations. Texas Medicaid assigned a unique Texas Provider Identifier ("TPI") number to each approved Texas Medicaid provider. A person or entity with a TPI number could file claims, also known as bills, with Texas Medicaid to obtain reimbursement for covered medical services which were furnished to Texas Medicaid recipients in accordance with the rules, regulations, and laws pertaining to the Medicaid program.

## DURABLE MEDICAL EQUIPMENT

13. Texas Medicaid would only pay reimbursement for medical services, including DME, which were prescribed by the recipient's physician and medically necessary to the treatment of the recipient's illness, injury, or condition. Texas Medicaid required that a completed "Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form" prescribing the DME and/or supplies be signed and dated by a physician familiar with the Texas Medicaid recipient.

Texas Medicaid also required that said form had to be maintained by the DME provider and the prescribing physician in the recipient's medical record. In addition, Texas Medicaid required that, before submitting a claim for payment, the DME provider had to obtain a "DME Certification and Receipt Form" from the Texas Medicaid recipient (also known as a "delivery ticket"). The DME Certification and Receipt Form was to be signed by both the Texas Medicaid recipient and the DME provider certifying the date that the DME was received by the Texas Medicaid recipient and that the DME had been prescribed by a physician, received by the Texas Medicaid recipient, properly fitted, and met the Texas Medicaid recipient's needs. The DME provider was required to keep that form on file in the patient's medical record.

14. To receive reimbursement from TMHP for medical services to recipients, Texas Medicaid providers submitted or caused the submission of claims to TMHP, either directly or through a billing company. Claims could be submitted either in paper form or electronically. Texas Medicaid providers could only submit claims on or after the "date of service" to the recipient. For DME, the date of services referred to the date on which the DME was delivered to, and accepted by, the Texas Medicaid recipient.

15. Texas Medicaid DME suppliers/providers were required to submit their Texas Medicaid claims on a standardized form commonly referred to as a "Form1500", "HCF 1500", or "CMS 1500." Certain specific information was required to be on each claim form, including but not limited to the following:

    a.    the recipient's name and unique personal Texas Medicaid identification number (PCN);

    b.    the date of service;

    c.    the specific uniform code for the diagnosis of, or nature of, the Texas Medicaid recipient's illness, injury, or condition;

   d.  the specific uniform national Healthcare Common Procedure Coding System (HCPCS) code established by CMS to define and describe the DME for which payment was sought;

   e.  the name and unique physician identification number ("UPIN") or national provider identifier ("NPI") of the physician who prescribed or ordered the DME for which payment was sought;

   f.  all applicable modifier codes.

  16. Modifier codes were sometimes required to provide additional information regarding the DME, such as when the information provided by a HCPCS code descriptor needed to be supplemented to identify specific circumstances that applied to the DME. For example, a "UE" modifier was used when the item identified by a HCPCS code was used equipment. A "NU" modifier was used for new equipment. The "KX" modifier was used by providers to represent to Texas Medicaid that the specific required documentation, such as the written physician order, or the "Home Health Services (Title XIX) Durable Medical Equipment (DME)/Medical Supplies Physician Order Form" and the "DME Certification and Receipt Form" described above, were on file in the patient's medical record maintained by the Texas Medicaid provider.

  17. DME providers in Texas were required to submit their Texas Medicaid bills or claims to TMHP. Although providers may have sometimes submitted claims in groups for efficiency, every claim was considered individually. Claims to Texas Medicaid were paid either by paper check delivered to the United States Postal Service or by wire or radio transmissions, in transactions known as electronic funds transfers.

  18. For each claim submitted, the Texas Medicaid provider certified, among other things, that: (a) the information on the claim form was true, accurate, and complete;

(b) the medical services had been provided to the Texas Medicaid recipient; and (c) the medical services listed on the claim were medically indicated and necessary to the health of the Texas Medicaid recipient.

19. Texas Medicaid rules excluded some types of DME. In addition, Texas Medicaid placed monthly or yearly limits on some DME. For example, various rules limited the quantity of incontinent supplies that were allowed to any recipient each month.

### A&C MEDICAL SUPPLIES, TENDER TEXAS HEART, AND THE DEFENDANTS

20. Defendant ANDRES ALY ALVAREZ, JR. was a resident of Hidalgo County, Texas and was a co-owner of Tender Texas Heart Home Health (hereinafter referred to as "Tender Texas Heart") in Hidalgo County, Texas and worked as a consultant and administrator at A&C Medical Supplies in Hidalgo County, Texas.

21. Defendant MARTHA JOSEFINA DOMINGUEZ was a resident of Webb County, Texas and was employed as the office manager at a doctor's office in Webb County, Texas.

22. On or about July 5, 2007, Tender Texas Heart became enrolled as a provider in the Medicare program. Provider # 1659579357 was assigned to Tender Texas Heart.

23. Tender Texas Heart ostensibly provided home health services to Medicare beneficiaries (hereinafter referred to as beneficiaries) in Hidalgo County and Webb County.

24. On or about April 4, 2008, A&C Medical Supplies became enrolled as a provider in the Medicare program. Provider # 601493001 was assigned to A&C Medical Supplies. On or about July 15, 2008, A&C Medical Supplies became enrolled as a provider in the Texas Medicaid program. Texas Provider Identifier # 1928947 was assigned to A&C Medical Supplies.

25. A&C Medical Supplies (hereinafter referred to as "A&C") ostensibly provided durable medical equipment to Texas Medicaid recipients (hereinafter referred to as recipients) in Hidalgo County.

## TEXAS MEDICAID BILLINGS AND PAYMENTS

26. From on or about January 1, 2008 through June 21, 2013, the defendants submitted or caused others to submit false or fraudulent claims in the approximate aggregate sum of $1,812,115.00 to Texas Medicaid, for durable medical equipment, which was not properly provided and/or not authorized. As a result of said false or fraudulent claims, Texas Medicaid paid the approximate aggregate sum of $930,276.53.

## COUNT ONE
## CONSPIRACY TO COMMIT HEALTH CARE FRAUD

27. The charge incorporates by reference paragraphs 1 through 26 as though fully restated and re-alleged herein.

28. Beginning on or about January 1, 2008 through on or about June 21, 2013, in the McAllen Division of the Southern District of Texas and elsewhere within the jurisdiction of the Court, the exact dates being unknown, defendants,

**ANDRES ALY ALVAREZ, JR.**
**and**
**MARTHA JOSEFINA DOMINGUEZ**

did conspire and agree together, with each other, and with other persons known and unknown, to knowingly and willfully, in violation of Title 18, United States Code, Section 1347, execute a scheme and artifice to defraud the health care benefit programs known as Texas Medicaid and Medicare or to obtain, by false or fraudulent pretenses, representations, or promises, any of the money and or property owned by or under the control of said health care benefit programs in

connection with the delivery of or payment for health care benefits, items, and medical services.

All in violation of Title 18, United States Code, Section 1349.

## OBJECT OF CONSPIRACY

29. The object and purpose of the conspiracy and scheme was to defraud the health care benefit programs known as Texas Medicaid and Medicare, and to obtain by false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of the health care benefit programs known as Texas Medicaid and Medicare, in connection with the delivery of, or payment for, health care benefits, items, or medical services.

## MANNER AND MEANS

30. In order to execute and carry out their illegal activities, defendants committed the following acts:

   (a) The defendants submitted or caused others to submit false or fraudulent claims with Texas Medicaid for reimbursement of durable medical equipment that was not provided and/or authorized by a physician. The defendants filed or caused others to file the claims with Texas Medicaid knowing that said claims were false and fraudulent since durable medical equipment for the recipients was not provided and/or was not authorized by a physician.

   (b) The defendants billed for more product (i.e. disposable under pads, pull-ons, and briefs/diapers) than that which was purchased from the distributors.

   (c) The defendants submitted or caused others to submit claims with Medicare for reimbursement of home health services that were not authorized by a physician and/or were not medically necessary. The defendants caused others to file the claims with Medicare knowing that said claims were false and fraudulent as the patients or Medicare beneficiaries did not need or qualify for home health services and the home health services had not been authorized as required by a physician.

   (d) Defendant MARTHA JOSEFINA DOMINGUEZ used her position as an office manager at a physician's office to gain access to patient names and their Medicare and Texas Medicaid numbers. Defendant MARTHA JOSEFINA DOMINGUEZ sold the patient information to Defendant ANDRES ALY ALVAREZ, JR.

  Defendant MARTHA JOSEFINA DOMINGUEZ was paid $25-$50 for said patient information in each A&C referral and $250-$300 in each Tender Texas Heart referral by Defendant ANDRES ALY ALVAREZ, JR. The defendants would then forge the signatures of the physician and use the patient information to create false or fraudulent 485 and Title XIX referral forms. Subsequently, Tender Texas Heart and A&C submitted false or fraudulent claims to Medicare and Texas Medicaid based on the falsified documentation.

(e) Defendant ANDRES ALY ALVAREZ, JR. directed employees/delivery drivers at A&C to ask the Texas Medicaid recipients how much supplies they needed, and if the recipients requested less supplies than that which appeared on the delivery tickets, said employees were instructed by the defendant to not change or modify the delivery tickets. The undelivered supplies were returned to the A&C warehouse and were restocked at the direction of the defendant. A&C would subsequently bill Texas Medicaid for the full amount of supplies listed on the delivery tickets as if the full amount had been delivered to the Texas Medicaid recipients.

(f) During and in relation to their fraudulent conduct and to further their scheme and artifice to defraud Medicare and Texas Medicaid, the defendants knowingly transferred, possessed, or used, or knowingly caused others to transfer, possess, or use, without lawful authority, one of more means of identification, specifically the name and physician identification number of Dr. N.A. and the names and Medicare and Texas Medicaid identification numbers of Medicare and Texas Medicaid beneficiaries, to execute their scheme and artifice to commit health care fraud.

### ACTS IN FURTHERANCE OF CONSPIRACY

31. See paragraph 30 above.

### COUNT TWO
### AGGRAVATED IDENTITY THEFT

32. The charge incorporates by reference paragraphs 1 through 26 and paragraph 30 as though fully restated and re-alleged herein.

33. Beginning on or about January 1, 2008 through on or about June 21, 2013, the exact dates being unknown, in the McAllen Division of the Southern District of Texas and elsewhere, the defendants,

ANDRES ALY ALVAREZ, JR.
and
MARTHA JOSEFINA DOMINGUEZ

during and in relation to a felony violation of Title 18, United States Code, Section 1347, Health Care Fraud, aiding and abetting one another, did knowingly transfer, possess, or use, without lawful authority, a means of identification of another person, including but not limited to the following:

| Count | Patient | Date of Alleged Service (On or about) | Date Billed (On or About) | Amount Billed | Reason Claim Submitted to Medicare Was False and Fraudulent | Means of ID Used Without Lawful Authority on False and Fraudulent Claim |
|---|---|---|---|---|---|---|
| 2 | M.H. | 4/4/11 | 8/16/11 | $351.00 | Home health services were not authorized by recipient's physician. Doctor's signature was forged on 485 form. | Name and physician identification number of Dr. N.A. |

All in violation of Title 18, United States Codes, Sections 1028A and 2.

KENNETH MAGIDSON
UNITED STATES ATTORNEY

BY: _____
MICHAEL E. DAY
ASSISTANT UNITED STATES ATTORNEY